UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| Plaintiff, | ) | |
| | ) | No. 4:13 CR 00289 HEA (TIA) |
| vs. | ) | |
| DARRELL SCOTT, | ) | |
| | ) | |

## DEFENDANT'S MOTION TO SUPPRESS IDENTIFICATION EVIDENCE

Comes now Defendant DARRELL SCOTT (hereinafter referred to as "Scott"), by and through counsel, and moves, pursuant to the due process clause of the Fifth Amendment, for an Order suppressing any in-court identification of Scott based on an impermissibly suggestive, unreliable show-up and photograph array. In support of said Motion, Defendant states as follows:

1. Two years after the alleged carjackings in this case, an anonymous person contacted Officer Thomas Mayer and stated that a person known to him as "Dooder" was involved in the carjackings.

2. Officer Mayer then conducted a computer inquiry into Darrell Scott and located his photograph in a police database.[1]

3. Officer Mayer looked at Scott's photograph and concluded that he was the suspect involved in the pursuit and escape from the carjackings.

4. Officer Mayer assembled a photograph array that included Scott's photograph and

---

[1] It is not clear from Officer Mayer's report how he connected the name "Dooder" with Darrell Scott, as "Dooder" is not identified in the MULES database as a known alias of Scott.

1

took it to the home of the witnesses to the carjacking involving a Dodge Caravan (Count III of the Superseding Indictment).

5. At the home, Officer Mayer showed the photo array to one witness, who identified Scott as the person who had committed the carjacking and robbery.

6. The witness then told Officer Mayer that although she had been embarrassed to tell police earlier, one of the robbers had fondled her breast during the robbery.

7. Officer Mayer then showed the array to the second witness, who identified Scott.

8. It is not clear whether the first witness was present when the second witness made this identification.

9. Officer Mayer, accompanied by other officers, then went to Scott's residence, arrested him, and later interrogated him at the St. Louis Metropolitan Police Department.

10. Scott anticipates that Officer Mayer will identify Scott in Court as the person who allegedly fled in the Chevy Lumina and allegedly pointed a gun at pursuing officers.

11. Scott further anticipates that the witnesses to the Dodge Caravan carjacking will identify Scott in Court as one of the robbers.

12. The one-photo show-up that Officer Mayer conducted was impermissibly suggestive, as was the photo array identification conducted in the witnesses' home.

13. The show-up and photo array were also unreliable, and as such any in-court identification based on these incidents would violate Scott's rights under the due process clause of the Fifth Amendment.

## **MEMORNADUM IN SUPPORT**

A due process challenge to an in-court identification requires a determination (1) whether the

challenged confrontation between the witness and suspect were impermissibly suggestive, and (2) if so, whether under the totality of the circumstances of the case, the suggestive confrontation created "a very substantial likelihood of irreparable misidentification." *Graham v. Solem*, 728 F.2d 1533 (8th Cir. 1984)( quoting *Simmons v. United States*, 390 U.S. 377, 384 (1968); and *Manson v. Brathwaite,* 432 U.S. 98, 116 (1977)). "Pared to its essence, the second inquiry is whether the identification is reliable." *Id*. (citation omitted). The factors relevant to reliability of the identification are: (1) the opportunity of the witness to view the criminal at the time of the crime, (2) the witness' degree of attention, (3) the accuracy of the witness' prior description of the criminal, (4) the level of certainty demonstrated by the witness at the confrontation, and (5) the length of time between the crime and the confrontation. *Id*. (quoting *Brathwaite*, 432 U.S. at 199-200).

Unnecessary suggestiveness "contains two component parts: that concerning the suggestiveness of the identification, and that concerning whether there was some good reason for the failure to resort to less suggestive procedures" *United States v. Brownlee*, 454 F.3d 131, 137 (3rd Cir. 2006)(citations omitted).

### Suggestive Show-Up

Officer Mayer's initial viewing of Darrell Scott's photograph constitutes a "show-up" ("in which a single individual arguably fitting a witness's description is presented to that witness for identification." *Brownlee,* 454 F.3d at 138). The Supreme Court "has acknowledged [that] a show-up procedure is necessarily suggestive" and "has been widely condemned." *Id*. (citing *Stovall v. Denno*, 388 U.S. 293, 302 (1967)). Officer Mayer has not indicated why he resorted to this show-up procedure instead of, for example, asking another officer to place Scott's photograph in a photo array before attempting to make an identification.

3

## Suggestive Photo Array

The photo array presented to the victims was also impermissibly suggestive, both in method and administration and in content. First, Officer Mayer, who had just decided that Scott was the suspect who pointed a weapon at him, personally administered the photo array at the victims' home immediately after making his own identification. As Justice Sotomayor has recognized, "An eyewitness who has made an identification often becomes convinced of its accuracy.*" Perry v. New Hampshire*, 132 S.Ct. 716, 732 (2012)(Sotomayor, J., dissenting). This is so despite the large body of scientific evidence showing "no meaningful correlation between confidence [in an identification] and accuracy [of that identification]." *Brownlee*, 454 F.3d at 142. n. 9. The witness' (possibly misplaced) certainty, in turn, can influence the identification procedure. The Supreme Court has frequently observed that "[p]ersons who conduct the identification procedure may suggest, intentionally or unintentionally, that they expect the witness to identify the accused." *Moore v. Illinois*, 434 U.S. 220, 224 (1977). Officer Mayer, by conducting a one-phone show-up, became convinced that Scott was in fact one of the occupants of the Lumina. He administered the photo array to witnesses very soon after making his identification. Under the circumstances, he is likely to have conveyed, albeit unintentionally, his certainty to the witnesses as they made their own identifications.

Second, the array itself was suggestive.[2] The persons in the photos did not look alike in significant ways. The person in Photo # 1 had much darker skin than the other subjects, while the person in Photo # 2 was markedly more light-skinned than any of the other subjects. The persons pictured in Photos # 4 and # 6 strongly resemble each other, making it difficult for a witness to

---

[2]A color copy of the photo array is attached to this Memorandum, marked Exhibit A.

differentiate between them, and thus unlikely to choose either one of them as s suspect due to their similarity.  The person in Photo # 3 is the only pictured subject with a large, visible scar on his forehead.  Finally, the photo of Darrell Scott, Photo # 5, pictures him with shorter hair than any of the other subjects, and Scott's hairline is receded to a greater degree than any of the other pictured subjects.[3]  In short, Scott's picture stands out among the photo array as different from all the others, rendering the array impermissibly suggestive.

Although a suggestive photo array does not mandate the exclusion of the evidence derived from it, reliability is the "linchpin in determining the admissibility of identification testimony." *Brownlee*, 454 F.3d at 138-139(citing *Neil v. Biggers*, 409 U.S. 188, 198-99 (1972) and quoting *Brathwaite*, 432 U.S. at 106).  Here, the circumstances of the identification itself weigh against a finding that the identification was reliable.  The witnesses had a limited opportunity at the time of the crime to view the perpetrators, telling police that both robbers had their shirts pulled up over the lower portions of their faces during the robbery.  Additionally, the robbery happened quickly.  The witnesses confessed to being very frightened during the robbery, so frightened that one could not remember whether both robbers were armed or not, and the other declined to view a line-up the next day, saying she was too upset.  Such emotional disturbance throws doubt on the witnesses' ability "to concentrate and remember" the robber's face.  *See United States v. Rogers*, 126 F.3d 655, 659 (5th Cir. 1997).  One witness was also too embarrassed to tell the police that one of the robbers had fondled her breast during the robbery, an allegation that she did not divulge until nearly two years later when she viewed the photo array that included Scott.

---

[3]Although standing alone, variations in hair length and facial hair are not impermissibly suggestive, (see *Burton v. St. Louis Board of Police Commissi*oners, 731 F.3d 784, 798 (8th Cir. 2013)(citation omitted), these variations are one of the circumstances that render the photo array impermissibly suggestive under the totality of the

Both witnesses described the robbers as follows: Suspect # 1: black male, 5'5"–5'7", 140-150 lbs., age19; Suspect # 2: black male, 5'9"–5'10", 150-155 lbs., age 19. At the time of his arrest in August, 2013, Darrell Scott was 5'9", weighed 160 lbs. and was 28 years old. Thus, he was heavier and substantially older than either suspect described by the witnesses at the time of the offense. The victims' descriptions were also very general and failed to note any distinguishing tattoos, scars, marks, or other characteristics.

Most important is the very long amount of time that elapsed between the robbery and the identification: almost two years (specifically, the period from August 27, 2011, the date of the robbery, to August 7, 2013, the date of the identification). The Supreme Court has called a lapse of seven months between crime and identification "a seriously negative factor in most cases." *Neil*, 409 U.S. at 201. Other courts have also found that a long delay between the crime and the identification cast doubt on the reliability of the identification's accuracy. *See, e.g., Rogers*, 126 F.3d at 659 (a ten-month delay "raises concerns about the accuracy of the [witness's] memory"); and *Marsden v. Moore*, 847 F.2d 1536, 1546 (11th Cir. 1988)(observing of a two-year delay, "human memory is bound to lose some degree of recall during such a prolonged period of time.") The two-year delay between robbery and identification in this case weighs heavily against a finding that the identifications were reliable.

Additional factors further suggest that the identifications are not reliable and should not be the basis for any in-court identification. First is the general "fallibility of eyewitness identifications," which the Supreme Court recently stated the Justices "do not doubt." *Perry*, 132 S.Ct. at 728. Indeed, Justice Sotomayor recently emphasized that "empirical evidence demonstrates

---

circumstances.

that eyewitness misidentification is 'the single greatest cause of wrongful convictions in this country.'" *Perry*, 132 S.Ct. at 739 (multiple citations omitted)(Sotomayor, J., dissenting). Justice Sotomayor also noted that "a staggering 76% of the first 250 convictions overturned due to DNA evidence since 1989 involved eyewitness misidentification." *Id*. at 738-39 (citation omitted).

Secondly, the witnesses in this case are of a different race than the suspected robbers. The increased chance of mistaking cross-racial identifications has been noted in many studies and cases. *See, e.g., Rogers*, 126 F.3d at 658 (citation omitted); Am. Psychological Ass'n., *Special Theme: The Other Race Effect and Contemporary Criminal Justice: Eyewitness Identification and Jury Decisionmaking*. 7 Psych. Pub. Pol'y & L, 3-262 (2001)(especially C. Meissner and J. Brigham, *Thirty Years of Investigating the Own-Race Bias in Memory for Faces: A Meta-Analytic Review, id.* at 3-35).

Other factors include (1) the likelihood that the witnesses in this case focused on the weapon(s) and not the faces or other identifying features of the robbers (*see Brownlee*, 454 F.3d at 137); (2) the likelihood that the witness' fears reduced their "ability to concentrate on and remember [the suspects'] face[s]," (*Rogers*, 126 F.3d at 659); and (3) the corrupting effect of the suggestive show-up on Officer Mayer's confidence in his identification of Scott as a suspect, which likely influenced his demeanor and statements while administering the photo array procedure (*see Perry*, 132 S.Ct. at 732 (quoting *Simmons,* 390 U.S. at 383-84)(Sotomayor, J., dissenting, and noting that "Suggestion bolsters" a witness "artificially inflated confidence in an identification's accuracy," thus impairing the jury's ability to "assess witness credibility and reliability.")

Finally, although the Sixth Amendment does not require the presence of counsel at a photo array, the right to counsel does attach at a pre-trial, post-indictment line-up. *United States v. Ash*,

7

413 U.S. 300, 321 (1973); *United States v. Wade*, 388 U.S. 218, 236-37 (1967).  Scott notes that although he was in custody and available to participate in a live line-up at the police station, Officer Mayer relied on the photo array administered at the witnesses' home instead of conducting a live line-up at the police station, despite the fact that Scott had already been appointed counsel on the heroin charges in the case.

## Conclusion

WHEREFORE, Defendant Scott respectfully requests that this Honorable Court grant his Motion to exclude any in-court identification based on the impermissibly suggestive, unreliable eyewitness identifications and for such other and further Orders as the Court deems proper in the premises.

*/s/ JoANN TROG*
JoANN TROG                42725MO
Attorney for Defendant
121 West Adams Avenue
St. Louis, Missouri 63122
Telephone:  (314) 821-1111
Fax:  (314) 821-9798
E-Mail:  Jtrogmwb@aol.com

## CERTIFICATE OF SERVICE

I hereby certify that on August 12, 2014, a copy of the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon Cristian M. Stevens and Sayler A. Fleming, Assistant United States Attorneys, 111 South 10th Street, 20th Floor, St. Louis, Missouri 63102.

/s/ *JoAnnTrog*