THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| UNITED STATES OF AMERICA, | ) |  |
|---|---|---|
|  | ) |  |
| Plaintiff, | ) |  |
|  | ) |  |
| v. | ) | No. 4:13CR289 HEA (TIA) |
|  | ) |  |
| DARRELL A. SCOTT, | ) |  |
|  | ) |  |
| Defendant. | ) |  |

## MEMORANDUM AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

The above matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(B). Defendant Darrell A. Scott (hereafter referred to as "Defendant" or "Scott") moves to suppress identification evidence and the Government has filed a response thereto. (Doc. No. 156). An evidentiary hearing was held on September 16, 2014. Based upon the evidence adduced at the hearing, the undersigned makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

Detective Thomas Mayer, a police officer with the St. Louis Metropolitan Police Department, testified that he and his partner, Officer Kevin Ryan, worked from 11:00 p.m. on August 26th to 7:00 a.m. on August 27th in uniform and in a marked police car. At about 6:00 a.m. on August 27, 2011, he and Officer Ryan responded to the scene of a robbery involving a Mr. and Mrs. Smith at 5322 Zealand. At that location Detective Mayer met the Smiths, an elderly couple in their 60's or 70's, who had been robbed of their minivan as they

1

were loading it to take items to church for a rummage sale when two males with handguns pulled up in a red Lumina automobile and took their minivan from them. Detective Mayer was aware that a red Lumina had been stolen at gunpoint earlier in the morning a short distance away from where the minivan was taken. The minivan was taken sometime between about 6:00 to 6:15 a.m., and the sun was already out and it was daylight. The victims said that music tapes were taken along with golf clubs which were being placed in the van to be sold at the rummage sale. The original carjacking of the Lumina also involved two people with one of them on a bike. Detective Mayer also knew that a shot had been fired in the prior incident and believed that the people who committed the robbery were still in the area because the red Lumina was still in the area. Because of this Detective Mayer and Officer Ryan went to the area where the red Lumina had been carjacked. They immediately saw the red Lumina coming down the street toward them on the North Florissant.

Detective Mayer rolled up next to the red Lumina which stopped directly parallel to him. He got a very good look at the driver of the vehicle and the passenger. After the car went on past him, he made a U-turn in back of it and activated his emergency lights. The vehicle did not stop and fled down several side streets at high speeds. Finally, the vehicle slid off the street and into the front porch of a house at 25th and Glascow.

After the car came to rest the passenger and the driver bailed out of the car by climbing out of the windows. The passenger climbed out the window directly in front of Detective Mayer and pointed a gun at him. The other driver pointed a gun at Officer Ryan. After the gun was pointed at him and as the passenger was fleeing the vehicle, Detective Mayer fired three shots at the passenger. The passenger fell out of the window onto the

ground and as he did so he dropped the gun back into the car. The passenger and the driver fled the scene on foot and the two officers then approached the vehicle to make sure no one else was in it and to see if the gun was still in the car. When he approached the passenger side of the vehicle, Detective Mayer observed a 40 caliber Glock in the front seat of the car. Officer Ryan and Detective Mayer and several other police officers then attempted to find the passenger and driver, but could not do so.

After their search for the perpetrators, the officers returned to the car and looked through it. In the car they discovered cassette tapes and golf clubs, which were eventually identified by the victims as items they placed in the vehicle. Later that day Detective Mayer received a phone call from a detective who identified the driver of the car as Carris King, also known as "Rico." The passenger was not identified at that time and Detective Mayer assumed that the case would go on as an unsolved crime.

During the ensuing two years Mayer would ask individuals arrested on similar crimes who wanted to cooperate with him about their knowledge of this incident. Finally, in August of 2013, a person who Detective Mayer had arrested related a story to him which Mayer found believable. He named Darrell Scott as the passenger in the two carjackings. Mayer typed "Darrell Scott" into his REJIS computer, and a mug shot history of Darrell Scott came up on his computer. This involved showing him several pictures of Darrell Scott. Mayer immediately and positively identified Darrell Scott from the photograph as the passenger of the vehicle. There was no doubt in his mind that it was the same person as Mayer had kept a "snapshot" in his mind of Scott. He also put together a photographic spread for the victims of the carjacking of the minivan, Mr. and Mrs. Smith. He also did this using the REJIS

computer trying to match complexion, hairstyle, background color, lighting, and facial hair. He tried to make them appear similar as to age and everything else at least from the neck up.

The undersigned has viewed the exhibits shown to the Smith's and finds it to be the Defendant and five other very similar looking males in a photographic spread of six individuals. In August of 2013, Detective Mayer showed the photographic spread to Mrs. Smith. He told Mrs. Smith that she didn't have to identify anyone and the person who robbed her may or may not be in the picture. He laid down the photo-spread in front of her and she immediately and positively identified the Defendant. She became somewhat emotional, circled the picture and put her initials down. She did not check the box saying that she had positively identified the photo. Mr. Smith then came to the home after Mrs. Smith called him. He was shown the photographic spread in the same manner and also immediately and positively identified the Defendant. As stated above, Mayer was also absolutely positive that Darrell Scott was the passenger in the red Lumina who had pointed a gun at him. After the three identifications, Mayer assembled an arrest team and arrested Defendant at his home in Ferguson, Missouri. He transported the Defendant back to the Central Patrol Station. On the way down in the police car, the Defendant asked Mayer what this was all about. Mayer replied it was about the streak of robberies you and Carris King were involved in. In response, Defendant stated "I knew they would catch up with me eventually". This was a voluntarily made statement not in response to anything asked by any police officer. After the Defendant arrived at the station, Mayer gave the Defendant his full Miranda rights from a Miranda form. Defendant said he understood each and every right and waived his right to silence by talking freely to the detective.

## ARGUMENTS OF THE PARTIES

Defendant asserts that due to their suggestiveness and lack of reliability, use of the identification made by the victims and by Detective Mayer would violate his rights under the Due Process Clause of the Fifth Amendment.

Specifically, Defendant contends that Detective Mayer's initial viewing of Defendant's photographs in the REJIS system constitutes a "show-up," a process whereby a single individual arguably fitting a witness's description is presented to that witness for identification. Defendant also asserts that the show- up and the photo array were impermissibly suggestive because Detective Mayer, who had identified Defendant while investigating information received from a confidential informant and then presented the photographic lineups to the Smiths "likely" conveyed to the victims his own certainty that Defendant was one of the individuals involved in the carjacking. Defendant also argues that the photo lineup was impermissibly suggestive because the persons included in the lineup "did not look alike in significant ways." Finally, Defendant contends that the identifications made by the victims and by Detective Mayer were unreliable because these individuals had a "limited opportunity" to view the suspects at the time of the carjacking and the lineups took place two years after the carjacking.

Defendant also asserts that the circumstances of the identification also weigh against a finding that the identification was reliable. Defendant specifically notes that the witnesses reported that the robbery happened quickly and both robbers had their shirts pulled up over the lower portions of their faces during the robbery. Defendant also notes that Mrs. Smith had initially been embarrassed to tell the officers that one of the robbers had fondled her

breast during the robbery.

In response, the Government asserts that when measured under the applicable legal standards the show up and the photo line-up identification procedures were proper and not impermissibly suggestive. In addition, the Government contends that even if the identification procedures are presumed suggestive, they are supported by sufficient indicia of reliability to avoid suppression or exclusion on Fifth Amendment grounds.

## **APPLICABLE LAW**

In *Perry v. New Hampshire*, 132 S. Ct. 716, 724 (2012), the United States Supreme Court reaffirmed the propriety of a two-part test to determine whether the Due Process Clause requires suppression of an eyewitness identification allegedly tainted by police arrangement. The Court explained that "due process concerns arise when law enforcement officers use an identification procedure that is both suggestive and unnecessary" and noted that "[e]ven when the police use such a procedure . . ., suppression of the resulting identification is not the inevitable consequence. *Id.* (citing *Manson v. Brathwaite*, 432 U.S. 98, 107 (1977); *Neil v. Biggers*, 409 U.S. 188, 199 (1972). Rather, the second step of the undue suggestiveness framework requires an inquiry into "whether under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive." *Neil*, 409 U.S. at 199. If an identification resulting from an unduly suggestive procedure is deemed reliable, it is admissible, "[n]otwithstanding the improper procedure" used by the police. *Perry*, 132 S.Ct. at 725; *see also United States v. Harris*, 636 F.3d 1023, 1026 (8th Cir. 2011) (holding that "'[c]onvictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the

photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification'") (quoting *Simmons v. United States*, 390 U.S. 377, 384 (1968)).

In *Howard v. Warden, Lebanon Correctional Inst.*, 519 Fed. App'x 360, 366 (6th Cir. 2013), the appellate court explained that when determining whether to suppress an eyewitness identification, courts should not consider the reliability of eyewitness evidence, *i.e.*, engage in part two of the test, unless the defendant satisfies the requirement of part one by proving that the police employed an unduly suggestive identification procedure. *Id.* (citing *Perry*, 132 S.Ct. at 725-26) (internal citation omitted). Unless there is a showing that law enforcement employed an unduly suggestive procedure to obtain identification, the unreliability of the identification alone will not preclude its use as evidence at trial. Instead, such lack of reliability should be exposed through the rigors of cross-examination. *Howard*, 519 Fed. App'x. at 366-367. As the Court in *Perry* added, "[w]hen no improper law enforcement activity is involved," reliability is better tested with tools such as "the presence of counsel at post indictment lineups, vigorous cross-examination, protective rules of evidence, and jury instructions on both the fallibility of eyewitness identification and the requirement that guilt be proved beyond a reasonable doubt." *Perry*, 132 S. Ct. at 721; *see also United States v. Rivera-Rivera*, 555 F.3d 277, 282 (1st Cir. 2009) (holding that "[a]lthough introduction of 'impermissibly suggestive' identification evidence may violate the Due Process Clause, we have stated repeatedly that identification evidence should be withheld from the jury only in extraordinary cases.") (internal quotations omitted)).

7

Due process challenges to in-court identifications require courts to determine (1) whether the challenged confrontation between the witness and suspect were impermissibly suggestive, and (2) if so, whether under the totality of the circumstances of the case, the suggestive confrontation created "a very substantial likelihood of irreparable misidentification." *Graham v. Solem*, 728 F.2d at 1541 (8th Cir. 1984) (quoting *Simmons*, 390 U.S. at 384 and *Brathwaite*, 432 U.S. at 116.

The first inquiry, relating to unnecessary suggestiveness, also "contains two component parts: that concerning the suggestiveness of the identification, and that concerning whether there was some good reason for the failure to resort to less suggestive procedures." *United States v. Brownlee*, 454 F.3d 131, 137 (3rd Cir. 2006) (citations omitted). In a "show-up" procedure "like that initially employed by Detective Mayer, a single individual arguably fitting a witness's description is presented to that witness for identification." *Id.*, 454 F.3d 131, 138 (3rd Cir. 2006). Although not *per se* impermissible such procedures are viewed "with suspicion." *See Brathwaite*, 432 U.S. at 109.

The second inquiry for purposes of the due process analysis is whether, regardless of its tendency to suggestiveness, the identification is reliable. *Graham*, 728 F.2d at 1541 (stating that when "[p]ared to its essence, the second inquiry is whether the identification is reliable") (internal citations omitted)). The factors relevant to reliability are: (1) the opportunity of the witness to view the criminal at the time of the crime, (2) the witness' degree of attention, (3) the accuracy of the witness' prior description of the criminal, (4) the level of certainty demonstrated by the witness at the confrontation, and (5) the length of time between the crime and the confrontation. *Id.* at 1542-1547 (citing *Brathwaite*, 432 U.S. at

199-200).

In assessing reliability, the Supreme Court has called a lapse of seven months between crime and identification "a seriously negative factor in most cases." *Neil*, 409 U.S. at 201. And other courts hold that a significant delay between the crime and the identification casts doubt on the reliability of the identification's accuracy. *See, e.g., Rogers*, 126 F.3d 655, 659 (5th Cir. 1997) (stating that a ten-month delay "raises concerns about the accuracy of the [witness's] memory"); and *Marsden v. Moore*, 847 F.2d 1536, 1546 (11th Cir. 1988) (observing with respect to a two-year delay, that "human memory is bound to lose some degree of recall during such a prolonged period of time"). Nonetheless, where other indicia of reliability are present, courts have deemed identifications reliable even where significant time has elapsed between the incident and identification. *See, e.g., United States v. West,* 523 Fed. App'x 602, 605 (7th Cir. 2012) (four years); *United States v. Peterson,* 411 Fed. App'x 857, 865 (6th Cir. 2011) (one year and eight months); *United States v. Clark*, 319 Fed. App'x 395, 402-03 (6th Cir. 2009) (five years); *United States v. Henderson*, 320 F.3d 92, 100, 101 (1st Cir. 2003) (two and one-half years); *United States v. Flores-Rivera,* 56 F.3d 319 331 (1st Cir. 1995) (seven years).

## **DISCUSSION**

Upon review of the applicable law, the parties' briefs, and the testimony adduced at the hearing, the undersigned is satisfied that use of the identification evidence here does not violate the Fifth Amendment Due Process Clause because the identification processes were not unduly suggestive. In addition, even if the procedures are presumed suggestive they are supported by sufficient indicia of reliability to pass muster under the Due Process Clause.

9

The Court first concludes that photo array presented to the Smiths was not suggestive. As evidenced by Government's Exhibits 1 and 2, all of the subjects included in the photo array were African American males with approximately the same amount of facial hair and similar hairstyles. All subject also appeared to be roughly the same age. Furthermore, with the exception of Photo #4, the backgrounds of the photographs are of the same color. *United States v. McComb*, 249 Fed. App'x 429, 440 (6th Cir. 2007). And the photograph of Defendant is neither the lightest nor the darkest in the lineup. Most importantly for purposes of this analysis, each subject matched the general description of Defendant provided by the victims.

The law prohibits suggestive and unreliable identification procedures but does not require perfect ones. *See United States v. Galati*, 230 F.3d 254, 260 (7th Cir. 2000) (stating that "a lineup of clones is not required"). Here any imperfections in the photo array do not render it impermissibly suggestive. *See, e.g.*, *United States v. Knight,* 382 Fed. App'x 905, 907 (11th Cir. 2010) (holding that "[a]lthough [the defendant] was of a lighter complexion than four of the other individuals in the array and the background lighting in his photograph was slightly different from some of the other photographs, neither of these differences were [sic] stark enough so as to be unduly suggestive"); *United States v. Devault*, 190 F.3d 926, 930 (8th Cir. 1999) (holding that "[a] darker hue or different colored background does not 'in [itself] create an impermissible suggestion that the defendant is the offender.'") (quoting *United States v. Burdeau*, 168 F.3d 352, 358 (9th Cir. 1999)).

Even in situations involving greater physical discrepancies between lineup subjects than those cited by Defendant, courts have not found the identification procedures

impermissibly suggestive. *See, e.g.*, *United States v. Isom*, 138 Fed. App'x 574, 582 (4th Cir. 2005) (holding that discrepancies with respect to hair length, attire, and facial hair among others did not render the lineup at issue suggestive); *United States v. Galati*, 230 F.3d 254, 259-260 (7th Cir. 2000) (holding that the lineup was not suggestive, where only two of six individuals displayed in the photo lineup had hair the same length as the defendant's and only one of those had the same hair color as defendant).

Moreover, the manner in which the photo lineup was presented to the Smiths was not impermissibly suggestive. The record indicates that Mr. and Mrs. Smith separately viewed the photo array consisting of Defendant and five other foils or distractors. *See United States v. Rose,* 362 F.3d 1059, 1066 (8th Cir. 2004) (affirming denial of motion to suppress a photographic lineup including six pictures of individuals with same basic features as not impermissibly suggestive). And the record does not reflect that Detective Mayer did or said anything that suggested to either victim which individual, if any, was the target of the investigation. Instead, the Smiths were specifically instructed that one of the individuals involved in the carjacking may or may not appear in the photo array and that they were not required to pick a subject. In addition, each victim viewed the lineup outside the presence of the other and did not confer with each other during their viewing of the lineup or while making an identification.

For these reasons, the undersigned concludes that the photographic identification procedures used for the Smiths were not impermissibly suggestive.

With respect to Detective Mayer's identification of Scott after he received information that Scott was with King during at least one of the carjackings, the Court

questions Defendant's assertion that this process should be characterized as "show-up" and therefore deemed suggestive. *See United States v. Patterson,* 20 F.3d 801, 806 (8th Cir. 1994) (holding that under Eighth Circuit law that single-photograph displays or show-ups are impermissibly suggestive). Here Detective Mayer did not first view Defendant's photograph as part of a lineup; rather, while conducting computer inquiries relative to the information provided by the informant, Detective Mayer observed from the mug shots that Defendant was the individual he had observed at close range fleeing after the car chase. However, even if the undersigned assumes that the detective's identification of Scott was a "show-up," the undersigned is satisfied that under the second prong of the analysis, Detective Mayer's identification of Defendant was nonetheless "reliable" and does not give rise to a substantial likelihood of irreparable misidentification. *See Perry*, 132 S.Ct. at 725-26

Although neither of the identification procedures used here was impermissibly suggestive, the undersigned will, out of an abundance of caution, consider the second prong of the due process analysis and assess the reliability of the identifications. In this regard the undersigned has considered the (1) the witnesses' opportunity to view the defendant at the time of the crime; (2) the witnesses' degree of attention at the time of the crime; (3) the accuracy of the witnesses' description of the defendant prior to the identification; (4) the witnesses' level of certainty when identifying the defendant at the confrontations; and (5) the length of time that elapsed between the crime and the confrontation. *See Neil*, 409 U.S. at 199-200; *United States v. Hadley*, 671 F.2d 1112, 1115-16 (8th Cir. 1982). Upon consideration of these factors and the totality of the circumstances, the undersigned

concludes that the identification procedures at issue were sufficiently reliable to permit their presentation to a jury.

First, in light of the authorities noted above, the undersigned concludes that the almost two-year lapse in time between the incident and the photographic lineup does not render the identifications unreliable. Courts have found significantly longer lapses of time acceptable. *See West*, 523 Fed .App'x at 605 (four years); *Clark,* 319 Fed. App'x at 402-03 (five years). Moreover, the lapse of time is only one factor in the analysis and, in this case, the lapse of time is outweighed by application of the remaining factors. For example, the Smiths and Detective Mayer viewed Defendant during the daytime and, at least at some point, had an unobstructed view of Defendant. In each instance, Defendant was no more than a few feet away from them. Mr. and Mrs. Smith had viewed the Defendant at close range as he exited the Lumina and approached their Caravan. Mrs. Smith also viewed the Defendant at close range as he held a gun to her head and fondled her breasts before stealing her vehicle. Detective Mayer observed Defendant during the auto chase, as he climbed through the Lumina's passenger window, as he aimed a firearm at both officers, and as he escaped on foot.

In addition, Detective Mayer is trained to be attentive and to carefully observe identify suspects. Given the circumstances, the Smiths also were focused on the Defendant and King and paid close attention to their appearance and features. This is evidenced by the fact that the descriptive features provided by each of the witnesses (particularly height, weight, and facial hair) were substantially accurate and uniform. Although the victims were unquestionably nervous at the time of the carjacking, their recollection of detail afterward

13

and its consistency with the evidence that was later recovered also reflects their attentiveness. Although the actual carjacking may have only lasted minutes, "under conditions of great stress [time] can pass quite slowly" and permit the opportunity for accurate observation. *United States v. Downs*, 230 F.3d 272, 275 (7th Cir. 2011) (holding that the identification was reliable although the robbery took only 50 seconds, and defendant was the only subject without a moustache who appeared in the lineup). In fact, upon viewing the photographic lineup, Mrs. Smith immediately identified Defendant and stated, "I'll never forget that face. He robbed us." Mr. Smith and Detective Mayer also made prompt, confident identifications.

The undersigned also has considered, as is permitted, the other evidence of Defendant's guilt, including the fact that Defendant's fingerprints and the victims' personal property were found in the Lumina, Defendant's admission that he was in the Lumina and present for the carjacking, and where, the Lumina matched the victim's description of the car driven by the individuals who stole their Caravan. *See Griffin v. Delo*, 33 F.3d 895, 909-919 (8th Cir. 1994). The undersigned therefore concludes that considering the totality of the circumstances, the three independent identifications were reliable and should not be suppressed.

## **CONCLUSION**

In accordance with the analysis set forth above the undersigned finds that the identification evidence derived from Officer Detective Mayer and from the Smiths should not be suppressed. It is hereby recommended that the Motion to Suppress Identification Evidence (Doc. No. 156) be denied. The parties are advised they have fourteen (14) days, in which to file written objections to this recommendation and determination. Failure to timely

14

file objections may result in waiver of the right to appeal questions or fact. *Thompson v. Nix*, 897 F.2d 357 (8th Cir. 1990).

          /s/ *Terry I. Adelman*
          TERRY I. ADELMAN
          UNITED STATES MAGISTRATE JUDGE

Dated this   12th   day of December, 2014.